FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

'10 MAR 26 PM 3: 06

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

THE COLLEGE NETWORK, INC.,     )
                                     )

          **Plaintiff,**          )  **1 : 10 -cv- 0 3 7 0 LJM & DML**

                                     )  CASE NO. _____

**v.**                                     )

                                     )

CINCINNATI INSURANCE COMPANY,  )

                                     )

          **Defendant.**          )

## COMPLAINT

For its Complaint against Defendant Cincinnati Insurance Company ("CIC"),

Plaintiff The College Network, Inc. ("TCN") states and alleges as follows:

### I.

### Parties and Jurisdiction

1.      TCN is an Indiana corporation with its principal place of business

located at 3815 River Crossing Parkway, Suite 260, Indianapolis, Indiana 46240.

2.      Upon information and belief, CIC is an insurance company organized

under the laws of Ohio with its principal place of business in Fairfield, Ohio.

3.      This Court has subject matter jurisdiction of this matter under 28

U.S.C. § 1332 because TCN and CIC are citizens of different states, and the amount

in controversy exceeds $75,000 exclusive of interest and costs.

4.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a

substantial part of the events or omissions giving rise to the claim occurred in this

District; and a substantial part of the property that is the subject of this action is situated in this District.

## II.

## General Allegations

5.     At all times relevant to the allegations in this Complaint, TCN is the insured under CIC Insurance Policy Number CPP 0826918 (the "Policy").

6.     The Policy contains a Crime Coverage Part Declaration, which includes Employee Dishonesty Coverage.

7.     Attached hereto as Exhibit A is a true and correct copy of the Policy's Crime Coverage Part Declarations.

8.     The Policy's Employee Dishonesty Coverage Form provides as follows:

> (i)     CIC will pay the loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss.

> (ii)    Covered Property means "Money," "securities," and "property other than money and securities."

> (iii)   Covered Cause of Loss means "Employee Dishonesty."

> (iv)    Employee Dishonesty means dishonest acts committed by an employee, ... , acting alone or in collusion with other persons, ..., with the manifest intent to:

>> (1)    Cause TCN to sustain Loss; and

>> (2)    obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

>>> (a)    The employee; or

           (b)    Any person or organization intended by the employee to receive that benefit.

9.    The Policy limit for Employee Dishonesty Coverage is $500,000.00.

10.    TCN is in the business of providing educational materials and services to individuals seeking certificates and degrees.

11.    TCN has sales representatives in various states that sell TCN's educational materials and services.

12.    TCN pays its sales representatives a commission for the sale of TCN's educational materials and services.

13.    TCN employed an individual ("Employee") from January 17, 2005 to May 1, 2009, in TCN's accounting department.

14.    From August 22, 2005 to May 1, 2009, Employee's title at TCN was Commissions Coordinator.

15.    As Commissions Coordinator, Employee's duties included the preparation, issuance and mailing of TCN commission checks to TCN sales representatives throughout the United States for commissions paid on specific sales of TCN educational products and services.

16.    The authorized commission checks prepared and issued by Employee were drawn on a TCN general operating bank account.

17.    On or about April 30, 2009, certain other TCN employees received information that raised questions regarding Employee's performance of her duties.

18.     Prior to April 30, 2009, TCN had no knowledge of any wrongdoing or dishonesty on the part of Employee in the performance of her duties.

19.     On or about April 30, 2009, TCN launched an internal investigation into Employee's activities.

20.     TCN's investigation revealed that Employee was, without the knowledge or authorization of TCN, removing additional sums from TCN's general operating bank account and transferring those sums to certain TCN sales representatives, in addition to sums which may have otherwise been appropriate and authorized ("Employee's Dishonesty").

21.     For example, for the period ending March 3, 2009, a TCN sales representative should have received $3,827.87 for commissions related to specific sales of TCN educational products and services.  Employee, however, manipulated the TCN computer system and caused it to issue a TCN check to this sales representative in the sum of $4,527.87.  The additional $700.00 fraudulently removed from TCN's general operating bank account and transferred to this sales representative was not authorized by TCN, nor owed to, or earned by, this sales representative.

22.     The additional $700.00 fraudulently removed from TCN's general operating bank account and transferred to this sales representative was not a commission and was wholly unrelated to the sale of any TCN educational products and services by the sales representative.

23. The fraudulent removal of funds from TCN's general operating bank account and transfer of those funds to this sales representative (and other sales representatives) was intended to benefit the sales representative or Employee, or both. During TCN's internal investigation, TCN learned that Employee requested "kickbacks" from more than one sales representative to whom she fraudulently transferred money.

24. In the example set forth in paragraphs 21-23, and with regard to the Employee Dishonesty Coverage of the Policy:

    (a) The $700.00 fraudulently removed from TCN's general operating bank account and transferred by Employee (and similar fraudulent removals and transfers as alleged herein) to the sales representative constitutes Covered Property in the form of money;

    (b) Employee's fraudulent removal and transfer of the $700.00 (and similar fraudulent removals and transfers as alleged herein) constitutes Employee Dishonesty because:

        (i)  Employee is an "employee";

        (ii)  the funds were transferred with the intent for TCN to sustain a loss; and

        (iii) the funds were transferred to financially benefit the sales representative or Employee, or both; and

    (c) Employee's Employee Dishonesty is a Covered Cause of Loss.

25.     Attached hereto as Exhibit B is a summary of sums Employee fraudulently removed from TCN's general operating bank account and fraudulently transferred as part of Employee's Employee Dishonesty in the same or similar manner as the act specifically described in ¶¶ 21-23 herein.

26.     The loss suffered by TCN as a result of Employee's Employee Dishonesty is in excess of $500,000.00.

27.     Immediately upon discovery of Employee's Employee Dishonesty, TCN contacted the Federal Bureau of Investigation ("FBI").

28.     Upon information and belief, the FBI is conducting a criminal investigation into Employee's Employee Dishonesty.

29.     Immediately upon discovery of Employee's Employee Dishonesty, TCN notified CIC of TCN's claim ("TCN's Claim") under the Policy.

30.     By letter dated May 15, 2009, CIC acknowledged receipt of TCN's Claim.

31.     On July 8, 2009, TCN provided CIC with a Sworn Proof of Loss regarding Employee's Employee Dishonesty.

32.     Attached hereto as Exhibit C is a true and correct copy (with names, addresses and any other identifying information redacted) of TCN's Sworn Proof of Loss.

33.     On September 30, 2009, CIC conducted a telephone interview of TCN's Chief Financial Officer, Robert Engle, regarding TCN's Claim and Employee's Employee Dishonesty.

34.     By letter dated December 8, 2009 (the "Letter of Denial"), CIC denied TCN's Claim.

35.     Attached hereto as Exhibit D is a true and correct copy (with names, addresses and any other identifying information redacted) of CIC's Letter of Denial.

36.     In summary, CIC asserts in its Letter of Denial that "the only financial benefit received by TCN employees was derived from the receipt of 'inappropriate advances' of 'commissions,'" and "any loss resulting from the failure of a current or former TCN employee to repay 'inappropriate commissions' received is not covered."

37.     As a further basis for its denial, CIC contends that CIC "would have to employ accountants to verify the accuracy of TCN's claimed basis."

38.     The basis of CIC's denial of coverage is contrary to the plain language of the Policy.

39.     The basis of CIC's denial of coverage is not supported by the evidence.

40.     CIC has no legitimate basis for denying TCN's Claim.

### III.

### Count I – Breach of Contract

41.     TCN incorporates by reference paragraphs 1 through 40 as if fully set forth herein.

42.     The Policy issued by CIC to TCN constitutes a valid contract of insurance.

43.     Employee's Employee Dishonesty is a Covered Cause of Loss under the Policy.

44. Employee's Employee Dishonesty has caused TCN to suffer a loss to Covered Property, as defined in the Policy, which loss is more fully described on Exhibit B hereto.

45. CIC's denial of coverage to TCN for the Employee Dishonesty described herein is a breach of the Policy.

46. TCN has been damaged by CIC's breach of the Policy.

47. TCN has complied with all of its obligations under the Policy and has not excused CIC's nonperformance.

WHEREFORE, TCN prays for judgment in its favor and against CIC in an amount to be proven at trial, together with pre-judgment interest and costs, and all other relief as is just.

## IV.

## Count II – Failure to Deal in Good Faith

48. TCN incorporates by reference paragraphs 1 through 47 as if fully set forth herein.

49. By virtue of the issuance of the Policy to TCN, CIC had a legal duty to deal in good faith with TCN.

50. CIC failed to act reasonably to investigate TCN's Claim prior to its denial.

51. CIC's refusal to pay proceeds to TCN pursuant to the Policy is wrongful and unfounded.

52. CIC had knowledge that it had no rational, good-faith basis for the denial of TCN's Claim.

53. CIC's unfounded denial of TCN's Claim constitutes a breach of CIC's duty to deal with its insured, TCN, in good faith.

54. TCN has been damaged by CIC's breach of its duty of good faith.

55. CIC has acted with malice, fraud, gross negligence and/or oppressiveness with respect to TCN's Claim.

56. CIC's actions are not the result of a mistake of fact or law, honest error or judgment, or mere negligence.

57. CIC's actions warrant an award of punitive damages and attorneys' fees to TCN.

WHEREFORE, TCN prays for judgment in its favor and against CIC in an amount to be proven at trial, together with attorneys' fees, punitive damages, costs and prejudgment interest, and all other relief as is just.

## DEMAND FOR TRIAL BY JURY

TCN, by counsel, hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

DONINGER TUOHY & BAILEY LLP

By: _____

Thomas A. Brodnik (#14508-49)
John J. Moore (#20633-32)
Anthony Ratliff (#18124-49)

tbrodnik@dtblegal.com
jmoore@dtblegal.com
aratliff@dtblegal.com
DONINGER TUOHY & BAILEY LLP
50 South Meridian Street, Suite 700
Indianapolis, Indiana 46204
317-638-2400 (Telephone)
317-633-6618 (Facsimile)
Attorneys for Plaintiff
The College Network, Inc.

# THE CINCINNATI INSURANCE COMPANY

### CINCINNATI, OHIO

A Stock Insurance Company

## CRIME COVERAGE PART DECLARATIONS

Attached to and forming part of POLICY NUMBER: **CPP 082 69 18**   Effective Date: **09-15-2007**

Named Insured   **REFER TO CA910**

Item   Location (address)
**REFER TO IA904**

Coverage is provided only for the Crime Coverage for which a Limit of Insurance is shown below:

| Coverage Forms Forming Part of This Coverage Part | Limit of Insurance | Deductible Amount |
|---|---|---|
| Employee Dishonesty Coverage Form A | $500,000 | $1,000 |
| Forgery or Alteration Coverage Form B | $500,000 | $1,000 |
| Theft, Disappearance and Destruction Coverage Form C | | |
| Loss Inside the Premises | $30,500 | $1,000 |
| Loss Outside the Premises | $30,500 | $1,000 |
| Robbery and Safe Burglary Coverage Form D | | |
| Loss Inside the Premises | $50,000 | $1,000 |
| Loss Outside the Premises | $50,000 | $1,000 |
| Safe Burglary | $ | $ |
| Premises Burglary Coverage Form E | $ | $ |
| Other | | |
| COMPUTER FRAUD COVERAGE FORM F | $500,000 | $1,000 |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

FORMS AND/OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:
**REFER TO CA901**

Cancellation of Prior Insurance:  By acceptance of this Coverage Part you give us notice canceling prior to policy or bond No.

**CPP 072 51 07**

the cancellation to be effective at the time this Coverage Part becomes effective.



**EXHIBIT**

**A**

CA 501 01 92

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CRIME COVERAGE SUPPLEMENTAL ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME COVERAGE PART**

**FORMS AND/OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CA901 | 01/92 | CA910 | 01/92 | CA401 | 01/86 | CR1000 | 10/90 |
| CA419UT | 09/99 | CA432IL | 04/04 | CR0134 | 06/95 | CR0155 | 05/02 |
| CR0242 | 01/06 | CR1050 | 01/89 | CR0001 | 01/86 | CR0003 | 01/86 |
| CR0004 | 10/90 | CR0005 | 10/90 | CR0007 | 10/90 | CR0180 | 08/07 |
| CR1027 | 01/86 | CR1536 | 06/95 | | | | |

CA 901 01 92

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CRIME COVERAGE SUPPLEMENTAL ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE PART

### NAMED INSURED SCHEDULE

```
THE COLLEGE NETWORK INC
AMERICAN CREDIT EXCHANGE
ASSOCIATION FOR DISTANCE LEARNING
ASSOCIATION FOR PROFESSIONAL CAREER DEVELOPMENT INC
DISTANCE LEARNING ASSOCIATION
UNITED FIRST FEDERAL FINANCE CORP
THE COLLEGE NETWORK 401K & GROUP PLAN
```

CA 910 01 92

**QUICK REFERENCE**

# COMMERCIAL CRIME COVERAGE PART

### READ YOUR POLICY CAREFULLY

## DECLARATIONS FORM(S)

1. Named Insured
2. Location of Premises or Location No.
3. Coverage, Limits of Insurance and Deductible (if applicable)
4. Endorsements Forming Part of This Policy When Issued
5. Cancellation of Prior Insurance

## COMMON POLICY CONDITIONS

A. Cancellation
B. Changes
C. Examination of Your Books and Records
D. Inspections and Surveys
E. Premiums
F. Transfer of Your Rights and Duties Under This Policy

## CRIME GENERAL PROVISIONS FORM

A. General Exclusions
   1. Acts Committed by You or Your Partners
   2. Governmental Action
   3. Indirect Loss
   4. Legal Expenses
   5. Nuclear
   6. War and Similar Actions

B. General Conditions
   1. Consolidation--Merger
   2. Coverage Extensions
   3. Discovery Period for Loss
   4. Duties in the Event of Loss
   5. Joint Insured
   6. Legal Action Against Us
   7. Loss Covered Under More Than One Coverage of This Insurance
   8. Loss Sustained During Prior Insurance
   9. Loss Covered Under This Insurance and Prior Insurance Issued by Us or Any Affiliate
   10. Non-Cumulation of Limit of Insurance
   11. Other Insurance
   12. Ownership of Property; Interests Covered
   13. Policy Period
   14. Records
   15. Recoveries
   16. Territory
   17. Transfer of Your Rights of Recovery Against Others to Us
   18. Valuation--Settlement

C. General Definitions
   1. "Employee"
   2. "Money"
   3. "Property Other Than Money and Securities"
   4. "Securities"

## COVERAGE FORM(S)

A. COVERAGE
   1. Section 1.--Inside the Premises
      a. Covered Property
      b. Covered Causes of Loss
      c. Coverage Extensions
   2. Section 2.--Outside the Premises
      a. Covered Property
      b. Covered Causes of Loss
      c. Coverage Extensions

B. LIMIT OF INSURANCE

C. DEDUCTIBLE (IF APPLICABLE)

D. ADDITIONAL EXCLUSIONS, CONDITIONS AND DEFINITIONS

Copyright, Insurance Services Office, Inc., 1984

# CRIME GENERAL PROVISIONS FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Words and phrases in quotation marks are defined in the policy.

Unless stated otherwise in any Crime Coverage Form, Declarations or endorsement, the following General Exclusions, General Conditions and General Definitions apply to all Crime Coverage Forms forming part of this policy.

## A. GENERAL EXCLUSIONS: We will not pay for loss as specified below:

1. **Acts Committed By You or Your Partners:** Loss resulting from any dishonest or criminal act committed by you or any of your partners whether acting alone or in collusion with other persons.

2. **Governmental Action:** Loss resulting from seizure or destruction of property by order of governmental authority.

3. **Indirect Loss:** Loss that is an indirect result of any act or "occurrence" covered by this insurance including, but not limited to, loss resulting from:

   a. Your inability to realize income that you would have realized had there been no loss of, or loss from damage to, Covered Property.

   b. Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance.

   c. Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

4. **Legal Expenses:** Expenses related to any legal action.

5. **Nuclear:** Loss resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident.

6. **War and Similar Actions:** Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident.

## B. GENERAL CONDITIONS

1. **Consolidation--Merger:** If through consolidation or merger with, or purchase of assets of, some other entity:

   a. Any additional persons become "employees;" or

   b. You acquire the use and control of any additional "premises;"

   any insurance afforded for "employees" or "premises" also applies to those additional "employees" and "premises," but only if you:

   a. Give us written notice within 30 days thereafter; and

   b. Pay us an additional premium.

2. **Coverage Extensions:** Unless stated otherwise in the Coverage Form, our liability under any Coverage Extension is part of, not in addition to, the Limit of Insurance applying to the Coverage or Coverage Section.

3. **Discovery Period for Loss:** We will pay only for covered loss discovered no later than one year from the end of the policy period.

4. **Duties in the Event of Loss:** After you discover a loss or a situation that may result in loss of, or loss from damage to, Covered Property you must:

   a. Notify us as soon as possible.

   b. Submit to examination under oath at our request and give us a signed statement of your answers.

   c. Give us a detailed, sworn proof of loss within 120 days.

   d. Cooperate with us in the investigation and settlement of any claim.

5. **Joint Insured:**

   a. If more than one Insured is named in the Declarations, the first named Insured will act for itself and for every other Insured for all purposes of this insurance. If the first named Insured ceases to be covered, then the next named Insured will become the first named Insured.

   b. If any Insured or partner or officer of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

   c. An "employee" of any Insured is considered to be an "employee" of every Insured.

   d. If this insurance or any of its coverages is cancelled or terminated as to any Insured, loss sustained by that Insured is covered only if discovered no later than one year from the date of that cancellation or termination.

 Copyright, Insurance Services Office, Inc., 1984, 1989

**e.** We will not pay more for loss sustained by more than one Insured than the amount we would pay if all the loss had been sustained by one Insured.

**6. Legal Action Against Us:** You may not bring any legal action against us involving loss:

    **a.** Unless you have complied with all the terms of this insurance; and

    **b.** Until 90 days after you have filed proof of loss with us; and

    **c.** Unless brought within 2 years from the date you discover the loss.

**7. Loss Covered Under More Than One Coverage of This Insurance:** If two or more coverages of this insurance apply to the same loss, we will pay the lesser of:

    **a.** The actual amount of loss; or

    **b.** The sum of the limits of insurance applicable to those coverages.

**8. Loss Sustained During Prior Insurance:**

    **a.** If you, or any predecessor in interest, sustained loss during the period of any prior insurance that you or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this insurance, provided:

        **(1)** This insurance became effective at the time of cancellation or termination of the prior insurance; and

        **(2)** The loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred;

    **b.** The insurance under this Condition is part of, not in addition to, the Limits of Insurance applying to this insurance and is limited to the lesser of the amount recoverable under:

        **(1)** This insurance as of its effective date; or

        **(2)** The prior insurance had it remained in effect.

**9. Loss Covered Under This Insurance and Prior Insurance Issued by Us or Any Affiliate:** If any loss is covered:

    **a.** Partly by this insurance; and

    **b.** Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

**10. Non-Cumulation of Limit of Insurance:** Regardless of the number of years this insurance remains in force or the number of

premiums paid, no Limit of Insurance cumulates from year to year or period to period.

**11. Other Insurance:** This insurance does not apply to loss recoverable or recovered under other insurance or indemnity. However, if the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this insurance will apply to that part of the loss, other than that falling within any deductible amount, not recoverable or recovered under the other insurance or indemnity.

However, this insurance will not apply to the amount of loss that is more than the applicable Limit of Insurance shown in the DECLARATIONS.

**12. Ownership of Property; Interests Covered:** The property covered under this insurance is limited to property:

    **a.** That you own or hold; or

    **b.** For which you are legally liable.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization.

**13. Policy Period**

    **a.** The Policy Period is shown in the Declarations.

    **b.** Subject to the Loss Sustained During Prior Insurance condition, we will pay only for loss that you sustain through acts committed or events occurring during the Policy Period.

**14. Records:** You must keep records of all Covered Property so we can verify the amount of any loss.

**15. Recoveries:**

    **a.** Any recoveries, less the cost of obtaining them, made after settlement of loss covered by this insurance will be distributed as follows:

        **(1)** To you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Insurance and the Deductible Amount, if any;

        **(2)** Then to us, until we are reimbursed for the settlement made;

        **(3)** Then to you, until you are reimbursed for that part of the loss equal to the Deductible Amount, if any.

    **b.** Recoveries do not include any recovery:

        **(1)** From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

        **(2)** Of original "securities" after duplicates of them have been issued.

**16. Territory:** This insurance covers only acts committed or events occurring within the

United States of America, U. S. Virgin Islands, Puerto Rico, Canal Zone, or Canada.

17. **Transfer of Your Rights of Recovery Against Others to Us:** You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

18. **Valuation - Settlement:**

   a. Subject to the applicable Limit of Insurance provision we will pay for:

   (1) Loss of "money" but only up to and including its face value. We may, at our option, pay for loss of "money" issued by any country other than the United States of America:

   (a) At face value in the "money" issued by that country; or

   (b) In the United States of America dollar equivalent determined by the rate of exchange on the day the loss was discovered.

   (2) Loss of "securities" for not more than their value at the close of business on the day the loss was discovered. We may, at our option:

   (a) Pay the value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities;"

   (b) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities." However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

   i. Value of the "securities" at the close of business on the day the loss was discovered; or

   ii. Limit of Insurance.

   (3) Loss of, or loss from damage to, "property other than money and securities" or loss from damage to the "premises" for not more than the:

   (a) Actual cash value of the property on the day the loss was discovered;

   (b) Cost of repairing the property or "premises;" or

   (c) Cost of replacing the property with property of like kind and quality.

   We may, at our option, pay the actual cash value of the property or repair or replace it.

   If we cannot agree with you upon the actual cash value or the cost of repair or replacement, the value or cost will be determined by arbitration.

   b. We may, at our option, pay for loss of, or loss from damage to, property other than "money:"

   (1) In the "money" of the country in which the loss occurred; or

   (2) In the United States of America dollar equivalent of the "money" of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered.

   c. Any property that we pay for or replace becomes our property.

## C. GENERAL DEFINITIONS

1. **"Employee"** means:

   a. Any natural person:

   (1) While in your service (and for 30 days after termination of service); and

   (2) Whom you compensate directly by salary, wages or commissions; and

   (3) Whom you have the right to direct and control while performing services for you.

   b. Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care and custody of property outside the "premises".

   But "employee" does not mean any:

   (1) Agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

   (2) Director or trustee except while performing acts coming within the scope of the usual duties of an employee.

2. **"Money"** means:

   a. Currency, coins and bank notes in current use and having a face value; and

   b. Travelers checks, register checks and money orders held for sale to the public.

3. **"Property Other Than Money and Securities"** means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property listed in any Crime Coverage Form as Property Not Covered.

4. **"Securities"** means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money."

Copyright, Insurance Services Office, Inc., 1984, 1989

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# UTAH CHANGES

This endorsement modifies insurance provided under the following:

### COMMERCIAL CRIME COVERAGE PART

**A.** When forming a part of this policy, Paragraph **a.** of the **Duties in the Event of Loss** General Condition of the Crime General Provisions and Paragraph **D.2.a.(1)** of the **Duties in the Event of Loss** Additional Condition of the Safe Depository Direct Loss Coverage Form are replaced by the following:

Notify us or our agent as soon as possible.

You may fulfill this requirement by mailing the notice to us, postage prepaid, through first class mail deposited in a United States Post Office.

**B.** When forming a part of this policy, Paragraph **c.** of the **Duties in the Event of Loss** General Condition of the Crime General Provisions and Paragraph **D.2.a(3)** of the **Duties in the Event of Loss** Additional Condition of the Safe Depository Direct Loss Coverage Form are replaced by the following:

Give us a detailed, sworn proof of loss within 120 days. We will, on request, promptly furnish you with any necessary forms and instructions.

Failure to submit the requested proof of loss within 120 days does not invalidate your claim, if you show that it was not reasonably possible to do so and that you submitted the proof of loss to us as soon as reasonably possible.

You may fulfill this requirement by mailing the proof of loss to us, postage prepaid, through first class mail deposited in a United States Post Office.

**C.** When forming a part of this policy, Paragraph **a.(3)** of the **Valuation - Settlement** General Condition in the Crime General Provisions is replaced by the following:

**(3)** Loss of, or loss from damage to, "property other than money and securities" or loss from damage to the "premises" for not more than the:

**(a)** Actual cash value of the property on the day the loss was discovered;

**(b)** Cost of repairing the property or "premises"; or

**(c)** Cost of replacing the property with property of like kind and quality.

We may, at our option, pay the actual cash value of the property or repair or replace it.

**D.** When forming a part of this policy, the **Legal Action Against Us** Condition in the Crime General Provisions and in the Safe Depository Direct Loss Coverage Form is replaced by the following:

Legal Action Against Us: You may not bring any legal action against us involving loss:

**a.** Unless proof of loss has been waived; or

**b.** Unless full payment has been denied; or

**c.** Until 60 days after you have filed proof of loss with us;

whichever is earlier and

**d.** Unless brought within 3 years from the date you discover the loss.

**E.** When forming a part of this policy, the Legal Action Against Us Condition in the:

Liability for Guests' Property - Safe Deposit Box Coverage Form **K**

Liability for Guests' Property - Premises Coverage Form **L**

Safe Depository Liability Coverage Form **M**

is deleted.

**F.** When forming a part of this policy, Additional Condition C.2.c.(1) Duties in the Event of Loss, Claim or Suit in the:

Liability for Guests' Property - Safe deposit Box Coverage Form **K**

Liability for Guests' Property - Premises Coverage Form **L**

Safe Depository Liability Coverage Form **M**

is replaced by the following:

**(1)** Notify us or our agent promptly of any loss, destruction or damage that may result in a claim.

You may fulfill this requirement by mailing the notice to us, postage prepaid, through

first class mail deposited in a United States Post Office.

**G.** When forming a part of this policy, Additional Condition **C.2.c.(2),** Duties in the Event of Loss, Claim or Suit in the:

Liability for Guests' Property - Safe Deposit Box Coverage Form **K**

Liability for Guests' Property - Premises Coverage Form **L**

Safe Depository Liability Coverage Form **M**

is replaced by the following:

**(2)** Give us or our agent prompt, written notice of any claim made or suit brought against you and:

You may fulfill this requirement by mailing copies to us, postage prepaid, through first class mail deposited in a United States Post Office.

Contains copyrighted material of Insurance Services Office, Inc., with its permission. Copyright, Insurance Services Office, Inc., 1996

**CA 419 UT 09 99**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES

This endorsement modifies insurance provided under the following:

### COMMERCIAL CRIME COVERAGE PART

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

### CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. **Cancellation of Policies in Effect 60 Days or Less**

   a. We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   b. If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   c. If we cancel for a reason other than nonpayment of premium, we will mail the notice at least:

      (1) 30 days prior to the effective date of cancellation if the policy has been in effect for less than 60 days.

      (2) 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. **60 Days or More**

   If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   a. Nonpayment of premium;

   b. The policy was obtained through a material misrepresentation;

   c. Any insured has violated any of the terms and conditions of the policy;

   d. The risk originally accepted has measurably increased;

   e. Certification to the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

**f.** A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supersedes any provision to the contrary:

### NONRENEWAL

1. If we decide not to renew this policy, we will mail written notice stating the reasons for nonrenewal no less than 60 days before the expiration date to:

   a. You; and

   b. The broker, if known to us, or the agent of record.

2. Even if we do not comply with these terms, this policy will terminate:

   a. On the expiration date if:

      (1) You fail to perform any of your obligations in connection with the payment of the premium for the policy, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

      (2) We have indicated our willingness to renew this policy to you or your representative; or

      (3) You have notified us or our agent that you do not want to renew this policy.

   b. On the effective date of any other insurance replacing this policy.

Includes copyrighted material of ISO
Properties, Inc., with its permission.

**C. Mailing of Notices**

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

**D.** The **Legal Action Against Us** Condition is replaced by the following:

**LEGAL ACTION AGAINST US**

You may not bring any legal action against us involving loss:

**a.** Unless you have complied with all the terms of this insurance; and

**b.** Until 90 days after you have filed proof of loss with us; and

**c.** Unless brought within 2 years from the date you discover the loss. But we will extend this 2 year period by the number of days between the date proof of loss is filed and the date the claim is denied in whole or in part.

**E.** The **Other Insurance** Condition is replaced by the following:

**OTHER INSURANCE**

You may have other insurance subject to the same plan, terms, conditions and provisions as this insurance. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance bears to the Limits of Insurance of all insurance covering on the same basis.

If there is other insurance covering the same loss or damage, other than that described above, we will pay only for the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

CA 432 IL 04 04

Includes copyrighted material of ISO Properties, Inc., with its permission.

Page 2 of 2

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME - LIABILITY FOR GUESTS' PROPERTY - SAFE DEPOSIT BOX COVERAGE FORM K
COMMERCIAL CRIME - LIABILITY FOR GUESTS' PROPERTY - PREMISES COVERAGE FORM L
COMMERCIAL CRIME - SAFE DEPOSITORY LIABILITY COVERAGE FORM M

**A.** The following sentence of Paragraph **A. Coverage** is deleted.

We have the right and duty to defend any suit brought against you seeking damages that are payable under this insurance.

The following sentence is substituted:

We will have the right and duty to defend any suit seeking those damages even if the allegations of the suit are groundless, false or fraudulent.

**B.** The following is added as Paragraphs **(3)** and **(4)** to the **Duties in the Event of Loss, Claim or Suit** Condition:

**(3)** Notice given by or on behalf of the insured, or written notice by or on behalf of the injured person or any other claimant, to any agent of ours in New York State, with particulars sufficient to identify the insured, shall be considered to be notice to us.

**(4)** The failure to give us prompt written notice of any loss, claim or suit or to send us copies of any demand, notice, summons or other legal papers received will not invalidate any claim made by you or free us from any responsibility in any suit if it can be shown not to have been reasonably possible to give the notice or forward the documents promptly, and that notice was given or the documents were sent as soon as reasonably possible.

**C.** The **Legal Action Against Us** Condition is replaced by the following:

**Legal Action Against Us**

No person or organization has a right under this insurance:

**(1)** To name us as a co-defendant in a suit asking for damages from you; or

**(2)** To sue us on this insurance unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against you. But we will not be liable for damages that are not payable under the terms of this insurance or that are in excess of the Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative.

**D.** The following condition is added:

**k. Transfer of Duties When a Limit of Insurance is Used Up**

**(1)** If we conclude that, based on claims or suits which have been reported to us and to which this insurance may apply, the Limit of Insurance shown in the Declarations is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured, in writing, to that effect.

**(2)** When a Limit of Insurance described in Paragraph **(1)** above has actually been used up in the payment of judgments or settlements;

**(a)** We will notify the first Named Insured, in writing, as soon as practicable, that such a limit has actually been used up and our duty to defend suits seeking damages subject to that limit has also ended.

**(b)** We will initiate and cooperate in, the transfer of control, to any appropriate insured, of all claims and suits seeking damages which are subject to that limit and which are reported to us before that limit is used up. That insured must cooperate in the transfer of control of said claims and suits.

We agree to take such steps, as we deem appropriate to avoid a default in, or continue the defense of, such suits until such transfer is completed, provided the appropriate insured is cooperating in completing such transfer.

We will take no action whatsoever with respect to any claim or suit see king damages that would have been subject to that limit, had it not been used up if the claim or suit is

Copyright, Insurance Services Office, Inc., 1994

reported to us after that Limit of Insurance has been used up.

**(c)** The first Named Insured, and any other insured involved in a suit seeking damages subject to that limit, must arrange for the defense of such suit within such time period as agreed to between the appropriate insured and us. Absent any such agreement, arrangements for the defense of such suit must be made as soon as practicable.

**(3)** The first Named Insured will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with Paragraph **(2)(b)** above.

The duty of the first Named Insured to reimburse us will begin on:

**(a)** The date on which the applicable Limit of Insurance is used up, if we sent notice in accordance with Paragraph **(1)** above; or

**(b)** The date on which we sent notice in accordance with Paragraph **(2)(a)** above, if we did not send notice in accordance with Paragraph **(1)** above.

**(4)** The exhaustion of any Limit of Insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this Condition.

CR 01 34 06 95          Copyright, Insurance Services Office, Inc., 1994

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CHANGES

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME COVERAGE FORM**
**COMMERCIAL CRIME POLICY**
**EMPLOYEE THEFT AND FORGERY POLICY**
**GOVERNMENT CRIME COVERAGE FORM**
**GOVERNMENT CRIME POLICY**

The following is added to the Section **E. Conditions:**

**ESTIMATION OF CLAIMS**

Upon request, we will furnish you, or your representative, with a written estimate of damages to real property, specifying all deductions, provided such an estimate has been prepared by us or has been prepared on our behalf for our own purposes. This estimate will be provided within thirty days after your request or its preparation, whichever is later.

©ISO Properties, Inc., 2001

CR 01 55 05 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# OREGON CHANGES

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME POLICY**
**EMPLOYEE THEFT AND FORGERY POLICY**
**GOVERNMENT CRIME POLICY**
**KIDNAP/RANSOM AND EXTORTION POLICY**

A. Paragraph **(2)** of the **Cancellation of Policy** Condition is replaced by the following:

    **(2)** If this policy has been in effect for:

        **(a)** Fewer than 60 days and is not a renewal policy, we may cancel for any reason.

        **(b)** 60 days or more or is a renewal policy, we may cancel only for one or more of the following reasons:

            **(i)** Nonpayment of premium;

            **(ii)** Fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy or in presenting a claim under the policy;

            **(iii)** Substantial increase in the risk of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation or court decision;

            **(iv)** Substantial breach of contractual duties, conditions or warranties;

            **(v)** Determination by the commissioner that the continuation of a line of insurance or class of business to which the policy belongs will jeopardize our solvency or will place us in violation of the insurance laws of Oregon or any other state; or

            **(vi)** Loss or decrease in reinsurance covering the risk.

B. Paragraph **(3)** of the **Cancellation of Policy** Condition is amended by the addition of the following:

    **(3)** We will mail or deliver to the first Named Insured written notice of cancellation, stating the reason for cancellation.

    If notice is mailed, a post office certificate of mailing will be conclusive proof that the first Named Insured received the notice on the third calendar day after the date of the certificate of mailing.

C. The following is added to the **Cancellation of Policy** Condition:

    **(7) Number of Days' Notice of Cancellation**

        We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

        **(a)** 10 days after the first Named Insured receives our notice, if we cancel for nonpayment of premium; or

        **(b)** 30 days after the first Named Insured receives our notice, if we cancel for any other reason.

D. Paragraph **(6)** of the **Cancellation of Policy** Condition does not apply.

E. The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

We may elect not to renew this policy by mailing or delivering to the first Named Insured, at the last mailing address known to us, written notice of nonrenewal before the:

**1.** Expiration date of the policy; or

**2.** Anniversary date of the policy if the policy is written for a term of more than one year or without a fixed expiration date.

However, if this policy is issued for a term of more than one year and for additional consideration the premium is guaranteed, we may not refuse to renew the policy at its anniversary date.

If notice is mailed, a post office certificate of mailing will be conclusive proof that the first Named Insured received the notice on the third calendar day after the date of the certificate of mailing.

Nonrenewal will not be effective until at least 45 days after the first Named Insured receives our notice.

CR 02 42 01 06             © ISO Properties, Inc., 2005

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NEW YORK STATE CHANGE

This endorsement applies only to Public Employee Dishonesty Coverage Form **O** or **P.**

**PROVISIONS**

Additional **Exclusions D.1.c.** and **D.1.d.** are deemed deleted from the Coverage Form.

# EMPLOYEE DISHONESTY COVERAGE FORM

## A. COVERAGE

We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss.

1. **Covered Property:** "Money", "securities", and "property other than money and securities".

2. **Covered Cause of Loss:** "Employee dishonesty".

3. **Coverage Extension:**

   **Employees Temporarily Outside Coverage Territory:** We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory General Condition for a period not more than 90 days.

## B. LIMIT OF INSURANCE

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.

## C. DEDUCTIBLE

1. We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

2. You must:

   a. Give us notice as soon as possible of any loss of the type insured under this Coverage Form even though it falls entirely within the Deductible Amount.

   b. Upon our request, give us a statement describing the loss.

## D. ADDITIONAL EXCLUSIONS, CONDITION AND DEFINITIONS: In addition to the provisions in the Crime General Provisions Form, this Coverage Form is subject to the following:

1. **Additional Exclusions:** We will not pay for loss as specified below:

   a. **Employee Cancelled Under Prior Insurance:** Loss caused by any "employee" for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation.

   b. **Inventory Shortages:** Loss, or that part of any loss, the proof of which as

to its existence or amount is dependent upon:

   (1) An inventory computation; or

   (2) A profit and loss computation.

2. **Additional Condition**

   **Cancellation As To Any Employee:** This insurance is cancelled as to any "employee":

   a. Immediately upon discovery by:

      (1) You; or

      (2) Any of your partners, officers or directors not in collusion with the "employee";

      of any dishonest act committed by that "employee" whether before or after becoming employed by you.

   b. On the date specified in a notice mailed to you. That date will be at least 30 days after the date of mailing.

      The mailing of notice to you at the last known address will be sufficient proof of notice. Delivery of notice is the same as mailing.

3. **Additional Definitions**

   a. **"Employee Dishonesty"** in paragraph A.2. means only dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons, except you or a partner, with the manifest intent to:

      (1) Cause you to sustain loss; and also

      (2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

         (a) The "employee"; or

         (b) Any person or organization intended by the "employee" to receive that benefit.

   b. **"Occurrence"** means all loss caused by, or involving, one or more "employees", whether the result of a single act or series of acts.

CR 00 01 01 86

# FORGERY OR ALTERATION COVERAGE FORM

## A. COVERAGE

We will pay for loss involving Covered Instruments resulting directly from the Covered Causes of Loss.

**1. Covered Instruments:** Checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

    **a.** Made or drawn by or drawn upon you;

    **b.** Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

**2. Covered Causes Of Loss:** Forgery or alteration of, on or in any Covered Instrument.

**3. Coverage Extension**

**Legal Expenses:** If you are sued for refusing to pay any Covered Instrument on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount we will pay under this extension is in addition to the Limit of Insurance applicable to this insurance.

## B. LIMIT OF INSURANCE

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.

## C. DEDUCTIBLE

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance. This provision does not apply to legal expenses paid under the Coverage Extension.

## D. ADDITIONAL EXCLUSION, CONDITIONS AND DEFINITION:
In addition to the provisions in the Crime General Provisions Form, this Coverage Form is also subject to the following:

**1. Additional Exclusion:**

**Acts of Employees, Directors, or Trustees:** We will not pay for loss resulting from any dishonest or criminal act committed by any of your "employees", directors, or trustees:

    **a.** Whether acting alone or in collusion with other persons;

    or

    **b.** Whether while performing services for you or otherwise.

**2. Additional Conditions:**

    **a. Facsimile Signatures:** We will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

    **b. General Amendment:** As respects this Coverage Form, the words Covered Property in the Crime General Provisions Form means Covered Instruments.

    **c. Proof of Loss:** You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

    **d. Territory:** We will cover loss you sustain anywhere in the world.

    The Territory General Condition does not apply to this Coverage Form.

**3. Additional Definition:**

**"Occurrence"** means all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

CR 00 03 01 86

# THEFT, DISAPPEARANCE AND DESTRUCTION COVERAGE FORM

**A. COVERAGE**--We will pay for loss of Covered Property resulting directly from the Covered Causes of Loss.

1. **Section 1.--Inside The Premises**:

   a. **Covered Property**: "Money" and "securities" inside the "premises" or a "banking premises."

   b. **Covered Causes of Loss**:

      (1) "Theft"

      (2) Disappearance

      (3) Destruction

   c. **Coverage Extensions**:

      (1) **Containers of Covered Property**: We will pay for loss of, and loss from damage to, a locked safe, vault, cash register, cash box or cash drawer located in the "premises" resulting directly from an actual or attempted:

         **(a)** "Theft" of; or

         **(b)** Unlawful entry into

         those containers.

      (2) **Premises Damage**: We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of Covered Property if you are the owner of the "premises" or are liable for damage to it.

2. **Section 2.--Outside the Premises**:

   a. **Covered Property**: "Money" and "securities" outside the "premises" in the care and custody of a "messenger."

   b. **Covered Causes of Loss**:

      (1) "Theft"

      (2) Disappearance

      (3) Destruction

   c. **Coverage Extension**:

      Conveyance of Property By Armored Motor Vehicle Company: We will pay for loss of Covered Property resulting directly from the Covered Causes of Loss while outside the "premises" in the care and custody of an armored motor vehicle company.

      But, we will pay only for the amount of loss that you cannot recover:
      (1) Under your contract with the armored motor vehicle company; and

      (2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

**B. LIMIT OF INSURANCE**

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the DECLARATIONS.

**C. DEDUCTIBLE**

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the DECLARATIONS. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

In the event more than one Deductible Amount could apply to the loss, only the highest Deductible Amount may be applied.

**D. ADDITIONAL EXCLUSIONS, CONDITIONS AND DEFINITIONS:**

In addition to the provisions in the Crime General Provisions, this Coverage Form is subject to the following:

1. **Additional Exclusions**: We will not pay for loss as specified below:

   a. **Accounting or Arithmetical Errors or Omissions**: Loss resulting from accounting or arithmetical errors or omissions.

   b. **Acts of Employees, Directors, Trustees or Representatives**: Loss resulting from any dishonest or criminal act committed by any of your "employees", directors, trustees or authorized representatives:

      (1) Acting alone or in collusion with other persons; or

      (2) While performing services for you or otherwise.

   c. **Exchanges or Purchases**: Loss resulting from the giving or surrendering of property in any exchange or purchase.

   d. **Fire**: Loss from damage to the "premises" resulting from fire, however caused.

   e. **Money Operated Devices**: Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

   f. **Transfer or Surrender of Property**:

      (1) Loss of property after it has been transferred or surrendered to a

person or place outside the "premises" or "banking premises":

(a) On the basis of unauthorized instructions; or

(b) As a result of a threat to do:

    i. Bodily harm to any person; or

    ii. Damage to any property.

(2) But, this exclusion does not apply under COVERAGE, Section 2. to loss of Covered Property while outside the "premises" or "banking premises" in the care and custody of a "messenger" if you:

(a) Had no knowledge of any threat at the time the conveyance began; or

(b) Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**g.** **Vandalism**: Loss from damage to the "premises" or its exterior or to containers of Covered Property by vandalism or malicious mischief.

**h.** **Voluntary Parting of Title to or Possession of Property**: Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

**2.** **Additional Condition**:

**Duties in the Event of Loss**: If you have reason to believe that any loss of, or loss from damage to, Covered Property involves a violation of law, you must notify the police.

**3.** **Additional Definitions**:

**a.** **"Banking Premises"** means the interior of that portion of any building occupied by a banking institution or similar safe depository.

**b.** **"Messenger"** means you, any of your partners or any "employee" while having care and custody of the property outside the "premises."

**c.** **"Occurrence"** means an:

(1) Act or series of related acts involving one or more persons; or

(2) Act or event, or a series of related acts or events not involving any person.

**d.** **"Premises"** means the interior of that portion of any building you occupy in conducting your business.

**e.** **"Theft"** means any act of stealing.

# ROBBERY AND SAFE BURGLARY COVERAGE FORM--PROPERTY OTHER THAN MONEY AND SECURITIES

**A. COVERAGE**--We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Causes of Loss.

1. **Section 1.--Inside The Premises**

   a. **Robbery Of A Custodian:**

      (1) **Covered Property:** "Property other than money and securities" inside the "premises" in the care and custody of a "custodian."

      (2) **Property Not Covered:** Motor vehicles, trailers, or semi-trailers or equipment and accessories attached to them.

      (3) **Covered Cause of Loss:** Actual or attempted "robbery."

      (4) **Coverage Extension**

         **Premises Damage:** We will pay for loss from damage to the "premises" or its exterior resulting directly from the Covered Cause of Loss, if you are the owner of the "premises" or are liable for damage to it.

   b. **Safe Burglary:**

      (1) **Covered Property:** "Property other than money and securities" inside the "premises" in a safe or vault.

      (2) **Covered Cause of Loss:** Actual or attempted "safe burglary."

      (3) **Coverage Extension**

         **Premises, Safe and Vault Damage:** We will pay for loss from damage to:

         (a) The "premises" or its exterior; or

         (b) A locked safe or vault located inside the "premises";

         resulting directly from the Covered Cause of Loss, if you are the owner of the property or liable for damage to it.

2. **Section 2.--Outside the Premises**

   a. **Covered Property:** "Property other than money and securities" outside the "premises" in the care and custody of a "messenger."

   b. **Property Not Covered:** Motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

   c. **Covered Cause of Loss:** Actual or attempted "robbery."

   d. **Coverage Extension:**

      **Conveyance Of Property By Armored Motor Vehicle Company:** We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss while outside the "premises" in the care and custody of an armored motor vehicle company.

      But, we will pay only for the amount of loss you cannot recover:

      (1) Under your contract with the armored motor vehicle company; and

      (2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

**B. LIMIT OF INSURANCE**

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the DECLARATIONS.

**C. DEDUCTIBLE**

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the DECLARATIONS. We will then pay the amount of loss in excess of the Deductible Amount up to the Limit of Insurance.

In the event more than one Deductible Amount could apply to the loss, only the highest Deductible Amount may be applied.

**D. ADDITIONAL EXCLUSIONS, CONDITIONS AND DEFINITIONS:**

In addition to the provisions in the Crime General Provisions, this Coverage Form is subject to the following:

1. **Additional Exclusions:** We will not pay for loss as specified below:

   a. **Acts of Employees, Directors, Trustees or Representatives:** Loss resulting from any dishonest or criminal act committed by any of your "employees", directors, trustees or authorized representatives:

      (1) Acting alone or in collusion with other persons; or

      (2) While performing services for you or otherwise.

CR 00 05 10 90     Copyright, Insurance Services Office, Inc., 1984, 1989     **Page 1 of 2**

**b.** **Fire**: Loss resulting from fire, however caused, except loss from damage to a safe or vault.

**c.** **Transfer or Surrender of Property**:

  (1) Loss of, or loss from damage to, property after it has been transferred or surrendered to a person or place outside the "premises":

    (a) On the basis of unauthorized instructions; or

    (b) As a result of a threat to do:

      **i.** Bodily harm to any person; or

      **ii.** Damage to any property.

  (2) But, this exclusion does not apply under COVERAGE, Section 2. to loss of Covered Property while outside the "premises" in the care and custody of a "messenger" if you:

    (a) Had no knowledge of any threat at the time the conveyance began; or

    (b) Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**d.** **Vandalism**: Loss from damage to any property by vandalism or malicious mischief.

**2.** **Additional Conditions**:

**a.** **Duties in the Event of Loss**: If you have reason to believe that any loss of, or loss from damage to, Covered Property involves a violation of law, you must notify the police.

**b.** **Special Limit of Insurance for Specified Property**: We will only pay up to $5,000 for any one "occurrence" of loss of, and loss from damage to:

  (1) Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

  (2) Manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

**3.** **Additional Definitions**:

**a.** **"Custodian"** means you, any of your partners or any "employee" while having care and custody of the property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

**b.** **"Messenger"** means you, any of your partners or any "employee" while having care and custody of the property outside the "premises."

**c.** **"Occurrence"** means an:

  (1) Act or series of related acts involving one or more persons; or

  (2) Act or event, or a series of related acts or events not involving any person.

**d.** **"Premises"** means the interior of that portion of any building you occupy in conducting your business.

**e.** **"Robbery"** means the taking of property from the care and custody of a person by one who has:

  (1) Caused or threatened to cause that person bodily harm; or

  (2) Committed an obviously unlawful act witnessed by that person.

**f.** **"Safe Burglary"** means the taking of:

  (1) Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

  (2) A safe or vault from inside the "premises."

**g.** **"Watchperson"** means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

# COMPUTER FRAUD COVERAGE FORM

**A. COVERAGE**--We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss.

    **1. Covered Property**: "Money", "Securities" and "Property Other Than Money and Securities."

    **2. Covered Cause of Loss**: "Computer Fraud."

## B. LIMIT OF INSURANCE

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the DECLARATIONS.

## C. DEDUCTIBLE

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the DECLARATIONS. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

In the event more than one Deductible Amount could apply to the loss, only the highest Deductible Amount may be applied.

## D. ADDITIONAL EXCLUSIONS, CONDITIONS AND DEFINITIONS: In addition to the provisions in the Crime General Provisions, this Coverage Form is subject to the following:

    **1. Additional Exclusions**: We will not pay for loss as specified below:

        **a. Acts of Employees, Directors, Trustees or Representatives**: Loss resulting from any dishonest or criminal act committed by any of your "employees", directors, trustees or authorized representatives:

            (1) Acting alone or in collusion with other persons; or

            (2) While performing services for you or otherwise.

        **b. Inventory Shortages**: Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

            (1) An inventory computation; or

            (2) A profit and loss computation.

    **2. Additional Conditions**:

        **a. Duties in the Event of Loss**: If you have reason to believe that any loss of, or loss from damage to, Covered Property involves a violation of law, you must notify the police.

        **b. Special Limit of Insurance for Specified Property**: We will only pay up to $5,000 for any one "occurrence" of loss of, and loss from damage to, manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

    **3. Additional Definitions**:

        **a. "Banking Premises"** means the interior of that portion of any building occupied by a banking institution or similar safe depository.

        **b. "Computer Fraud"** means "theft" of property following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises" to a person (other than a "messenger") outside those "premises" or to a place outside those "premises."

        **c. "Messenger"** means you, any of your partners or any "employee" while having care and custody of the property outside the "premises."

        **d. "Occurrence"** means an:

            (1) Act or series of related acts involving one or more persons; or

            (2) Act or event, or a series of related acts or events not involving any person.

        **e. "Premises"** means the interior of that portion of any building you occupy in conducting your business.

        **f. "Theft"** means any act of stealing.

Copyright, Insurance Services Office, Inc., 1983, 1989

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INCLUDE THE FAMILY OF BUILDING MANAGER, SUPERINTENDENT OR JANITOR AS EMPLOYEES - NEW JERSEY

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME COVERAGE FORM**
**COMMERCIAL CRIME POLICY**
**EMPLOYEE THEFT AND FORGERY POLICY**

The definition of "employee" is amended to include the following:

1. Spouse or party to a civil union recognized under New Jersey law; and

2. Children over 18 years old;

who reside with any "employee" who is a building manager, superintendent or janitor.

Each such family is considered to be, collectively, one "employee" for the purposes of this insurance, except that the **Termination As To Any Employee** Condition applies individually to the spouse or party to a civil union, and children.

© ISO Properties, Inc., 2007

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WELFARE AND PENSION PLAN ERISA COMPLIANCE

Provision 1. of this endorsement applies to the CRIME GENERAL PROVISIONS FORM and all Crime Coverage Forms forming part of the Policy. The other provisions of this endorsement apply only to the EMPLOYEE DISHONESTY COVERAGE FORM A--BLANKET.

**PROVISIONS** In compliance with certain provisions of the Employee Retirement Income Security Act (ERISA):

1.  "Employee" also includes any natural person who is:

    a.  A trustee, an officer, employee, administrator or a manager, except an administrator or a manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan (hereafter called Plan) insured under this insurance, and

    b.  Your director or trustee while that person is handling funds or other property of any Plan insured under this insurance.

2.  If any Plan is insured jointly with any other entity under this insurance, you or the Plan Administrator must select a Limit of Insurance for the

EMPLOYEE DISHONESTY COVERAGE FORM that is sufficient to provide an amount of insurance for each Plan that is at least equal to that required if each Plan were separately insured.

3.  If the Insured first named in the Declarations is an entity other than a Plan, any payment we make to that Insured for loss sustained by any Plan will be held by that Insured for the use and benefit of the Plan(s) sustaining the loss.

4.  If two or more Plans are insured under this insurance, any payment we make for loss:

    a.  Sustained by two or more plans or

    b.  Of commingled funds or other property of two or more Plans

    that arises out of one "occurrence", is to be shared by each Plan sustaining loss in the proportion that the amount of insurance required for each such Plan under ERISA provisions bears to the total of those amounts.

5.  The **Deductible** provision of the EMPLOYEE DISHONESTY COVERAGE FORM does not apply to loss sustained by any Plan subject to ERISA which is insured under this insurance.

**CR 10 27 01 86**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SUBLIMITS FOR MONEY AND SECURITIES

This endorsement modifies insurance provided under the following:

| Coverage Form | Section | Title |
|---|---|---|
| ☒ C | ☒ 1 ☒ 2 | THEFT, DISAPPEARANCE AND DESTRUCTION |
| ☐ Q | ☐ 1 ☐ 2 | SAFEROBBERYANDBURGLARY-MONEY AND SECURITIES |

## A. SCHEDULE*

Addresses of Premises  _____

| Property | Section 1 | | | Section 2 |
|---|---|---|---|---|
| | Form C | Form Q | | |
| | | Robbery | Safe Burglary | |
| Money and Securities | $ **500** | $ _____ | $ _____ | $ **500** |
| Securities | $ _____ | $ _____ | $ _____ | $ _____ |
| Checks | $ **30,000** | $ _____ | $ _____ | $ **30,000** |
| Total | $ **30,500** | $ _____ | $ _____ | $ **30,500** |

## B. PROVISIONS

As respects loss at or in relation to the premises shown in the Schedule , the Limit of Insurance shown in the Declarations is changed to the limit shown in the Schedule for the type of property indicated.

*Information required to complete this Schedule, if not shown on this endorsement will be shown in the Declarations.

**CR 15 36 06 95**        Copyright, Insurance Services Office, Inc., 1994

Case 1:09-cv-00370-JMS-DML Document 62-1 Filed 11/26/10 Page 38 of 48 PageID
Case 1:10-cv-00370-LJM-DML Document 12 Filed 03/26/10 Page 8 of 9
#: 317

|  |  |
|---|---|
| Sales Representative 1 | 9,899.17 |
| Sales Representative 2 | 2,646.83 |
| Sales Representative 3 | 80,520.32 |
| Sales Representative 4 | 101,623.59 |
| Sales Representative 5 | 83,371.80 |
| Sales Representative 6 | 1,053.13 |
| Sales Representative 7 | 161,221.38 |
| Sales Representative 8 | 18,086.27 |
| Sales Representative 9 | 27,385.30 |
| Sales Representative 10 | 35,193.89 |
| | |
| Totals | 521,001.68 |

**EXHIBIT**

B

tabbies



**THE**
# CINCINNATI INSURANCE COMPANIES

☐ THE CINCINNATI INSURANCE COMPANY  ☐ THE CINCINNATI INDEMNITY COMPANY  ☐ THE CINCINNATI CASUALTY COMPANY
☐ THE CINCINNATI LIFE INSURANCE COMPANY  ☐ THE CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY

6200 South Gilmore Road • Fairfield, Ohio 45014-5141
Mailing Address: P.O. Box 145496 • Cincinnati, Ohio 45250-5496
513-870-2000

## PROOF OF LOSS (Employee Dishonesty)

The College Network, Inc. _____ engaged in the business of ___educational services___
(Name of Employer/Insured)                                                      (Type of Business)

at _____3815 River Crossing Parkway, Suite 260, Indianapolis, IN 46240_____ being the Insured
(Street, City and State)

under Policy/Bond No. ___CPP 082 69 18___, with an inception date of _____September 15_____, 20 07
(Number)

and containing Employee Dishonesty Coverage with a Limit of Liability of $___500,000___ does hereby present claim for loss resulting from

the default of _____ whose home address is :_____ Social Security
(Name of Employee)                                                          (Employee's Complete Address)

No. __ __ __ __, DOB _____, who is/was employed in the position of Commissions Coordinator at _____
(Employee's Last Job Description)

_____3815 River Crossing Parkway, Suite 260, Indianapolis, IN 46240_____
(Address of Employee's Last Place of Employment)

The Employee named above has been continuously in the employ of said Employer/Insured for the period beginning

_____January 17, 2005_____ and ending _____May 1_____, 20 09 ; the employment
(Employee's Date of Hire)                              (Employee's Date of Discontinuation)

having been discontinued by reason of _____employee defalcation and dishonesty_____; said
(Cause of Employee's Discontinuation of Employment)

Employee's default was discovered by the Employer/Insured on the ___30th___ day of _____, 20 09

(Note: If more than one known Employee has caused this loss, an additional Proof of Loss must be completed for each Employee, signed and notarized and attached hereto )

## DETAILED STATEMENT OF CLAIM

| DATE | DESCRIPTION OF ITEM | AMOUNT |
|------|---------------------|--------|
|  | See attached. |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

(Attach Additional Sheets if Necessary )

Gross Loss (^)                                            $_____

Less Credits:
   Salary/Commission (Paid or Due)                        $_____
   Cash Deposit                                           $_____
   Cash Deductions Toward Purchase
   of Bonds, Stocks, etc.                                 $_____
                                                          $_____
   Total Credits

                              Net Loss                    $ 648,899 73
                              Deductible                 –$ 1,000 00
                              Claim                       $ 647,899 73

• Wherever in this affidavit claim is made for merchandise, said merchandise is herein listed at the cost price of same to the Employer/Insured, exclusive of profits, etc.

(OVER)

CL-1006 (12/07)

**EXHIBIT**

C

State of _____ Indiana _____

County of _____ Hamilton _____

On this __ 8 th __ day of __ July _____, 20 __ 09 __, before me, a Notary Public, in and for the State

and County aforesaid, personally appeared _____ Bob Engle _____, to
                                          (Name of Person Signing This Affidavit)

me known, who, being duly sworn according to law, deposes and says that he/she is _____ Chief Financial Officer _____ of
                                                                                      (Owner, Partner, President, etc.)

_____ The College Network, Inc. _____
                                                                                      (Employer/Insured)

and that the above statement/affidavit is true and correct in every respect; and that the financial gain indicated opposite the items listed therein were received by the said Employee, or someone of the said Employee's choosing, on the dates and in the respective amounts set opposite each, and that the items listed therein were misappropriated by said Employee through the dishonest acts of said Employee, which acts were committed with the manifest intent to cause the Employer/Insured to suffer this loss

Further, that there are no offsets whatever against said claim for salary, commissions, cash or other deposits except as set forth particularly on the above statement/affidavit; that the said Employer/Insured has fully complied with all of the conditions of the Policy/Bond, issued by The Cincinnati Insurance Company/The Cincinnati Casualty Company/The Cincinnati Indemnity Company/The Cincinnati Specialty Underwriters Insurance Company (hereinafter known as Cincinnati), of Fairfield, Ohio, on behalf of the said Employee and that the said Employer/Insured has not released said Employee of liability and has not accepted any security for or on account of same, except _____
_____ N/A _____

Further, that said Employer/Insured does hereby grant to Cincinnati the absolute right to disclose and/or release a copy of this Proof of Loss and the documentation presented by said Employer/Insured in support of this claim, to the persons named herein and to any other person(s), who, in Cincinnati's sole discretion it is deemed necessary, in order for Cincinnati to complete any investigation, settlement or recovery effort undertaken.

Further, that said Employer/Insured does hereby ratify his/her obligation to cooperate fully with Cincinnati relative to any investigation, settlement or recovery effort undertaken by Cincinnati, in regard to the claim herewith submitted, and all other obligations as required by the Policy/Bond specified above.

Further, that said Employer/Insured holds no other bond or policy of any kind covering this loss or any part thereof, except ___ N/A ___
_____

This Proof of Loss replaces the Proof of Loss previously submitted with a date of _____ N/A _____, 20 __ 09 __

ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.

_____ C F O
                                                (Signature)

Subscribed and sworn to before me, the undersigned at ___ 3815 River Crossing Parkway, Suite 260, Indianapolis, IN 46240 ___

this __ 8 th __ day of __ July _____, 20 __ 09 __

_____
                                                (Notary Public)

My commission expires:

_____ April 5, 2015 _____
                                                SEAL

The College Network, Inc.
Proof of Loss - Detailed Statement of Claim



This Detailed Statement of Claim is submitted with the Proof of Loss filed by The College Network, Inc. ("TCN") with the Cincinnati Insurance Companies on July 8, 2008. The investigation of this matter continues and TCN reserves the right to amend or supplement this Statement as discovery warrants.

███████████ was hired by TCN on January 17, 2005. ███████████ employment began in the accounting department. On August 22, 2005, she was promoted to Commissions Coordinator. As Commissions Coordinator, ██████████ duties included the preparation, issuance and mailing of TCN commission checks to TCN sales representatives located in various states throughout the United States. ██████████ prepared, issued and mailed commission checks every two weeks. Commissions were based on the sale of TCN educational products. Approximately 100 - 200 sales representatives received commission checks prepared by ████ ██████ every two weeks. The commission checks were drawn on a TCN bank account. From the time of her hiring through April 30, 2009, TCN had no knowledge of any wrongdoing on the part of ██████████ in the performance of her duties.

On April 30, 2009, TCN's President, ██████████, was advised that ██████████ made a statement to another employee that raised questions about ██████████ performance of her duties. ██████████ statement was made on April 28th or 29th, 2009, and was to the effect that ██████████ "took care of certain sales representatives in the field, and they took care of her."

TCN immediately launched an internal investigation into ██████████ payment of sales representatives. The investigation revealed that ██████████ had been paying certain sales representatives sums in addition to what they were owed for sales. For example, ██████████ would pay the sales representative who was owed $1,500, the sum of $3,000. It appears that ████ ██████ received financial payment from the sales representative in return. With regard to one sales representative, ██████████ requested that the sales representative buy ██████████ an expensive purse with the additional funds she sent him. TCN estimates that ██████████ received at least $30,000 in kick-backs from sales representatives she overpaid. ██████████ was terminated from TCN's employ on May 1, 2009.

TCN's investigation has discovered that ██████████ began paying sales representatives sums in addition to what they were owed in 2006. This was done in various ways, among them not deducting 'recaptured' commissions, adding dollar amounts to commissions earned, overwriting subtotals and other excel calculations, and not recovering approved advances in subsequent periods. Attached hereto is a detailed summary of the overpayments which TCN has uncovered to date. TCN continues to investigate these matters and, as such, reserves the right to supplement this claim with additional losses as they may become known. The summary lists the sales representative, and date and amount of overpayment. ██████████ overpayments to TCN sales representatives constitute dishonest acts under TCN's Insurance Policy with Cincinnati, Policy No. 05CPP0826918 as well as any other policies issued to TCN under which coverage might apply, and with the exception of the overpaid sales representatives, were done without the knowledge of TCN's officers, management and other employees. ██████████, a TCN sales

representative in California, has advised TCN that he kick-backed to ▆▆▆▆▆ approximately $30,000 of the overpayments ▆▆▆▆▆ paid ▆▆▆▆▆.

TCN has filed a report with the Federal Bureau of Investigations. TCN is cooperating with the FBI's investigation. An excel file is provided that shows all advisors who received inappropriate advances and/or did not repay advances once received. Included in the file and netted from the claim are amounts that have been recovered from advisors since the discovery of the loss.



THE
# CINCINNATI INSURANCE COMPANIES
THE CINCINNATI INSURANCE COMPANY      THE CINCINNATI INDEMNITY COMPANY
THE CINCINNATI CASUALTY COMPANY     THE CINCINNATI LIFE INSURANCE COMPANY
THE CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY

Mailing Address:       P.O. BOX 145496
CINCINNATI, OHIO 45250-5496
513-870-2130
513-603-5099 Fax
mike_fox@cinfin.com

**MICHAEL F. FOX, AIM, CPCU**
Associate Manager – Bond Claims
Claims Department

December 8, 2009


The College Network, Inc.
C/O Thomas A. Brodnik, Esq.
DONINGER, TUOHY & BAILEY LLP
50 South Meridian Street, suite 700
Indianapolis, IN 46204

RE:    The College Network, Inc.
       Policy No. CPP 082 69 18
       Claim No. 1118491

Dear Mr. Brodnick,

      The purpose of this letter is to briefly explain the primary reasons Cincinnati Insurance Company has determined that the information presented to date in support of The College Networks (TCN) July 8, 2009 sworn Proof of Loss in the amount of $648,899.73 does not establish a compensable loss within the scope of the Insuring Agreement of the Employee Dishonesty Coverage Form of Policy Number CPP 0826918. This letter is based upon Cincinnati's analysis of the evidence that TCN has presented to Cincinnati to date. If TCN or its attorneys believe that Cincinnati has overlooked or failed to adequately consider any material evidence that has been presented by TCN, or if TCN has become aware of any additional evidence that TCN has not yet presented to Cincinnati that TCN or its attorneys believe ought to alter Cincinnati's position, please let us know.

      Cincinnati will meet with TCN and/or its attorneys to discuss TCN's claim and Cincinnati's position at TCN's request. Please understand, however, that this letter and any previous or subsequent communications between Cincinnati and TCN are not a waiver of any rights or defenses that Cincinnati has, or may have, with regard to the claim of TCN. Cincinnati fully reserves all rights and defenses that it has or may have with regard to the claim asserted and we also reserve our rights to further investigate this claim should TCN, following it's review of this correspondence, present additional documentation to CIC in support of it's claim.



EXHIBIT
D



*6200 S. Gilmore Road, Fairfield, Ohio 45014-5141*

**Limit of Liability**

Before turning to a discussion of the merits of TCN's claim based upon the alleged dishonest conduct of TCN's former Commissions Coordinator, ███████ ████████, in making "inappropriate advances" of commissions to 41 of TCN's 221 sales representatives in exchange for "at least $30,000 in kick-backs from sales representatives she overpaid", please note that the maximum potential indemnity available to TCN for all losses alleged in TCN's Proof of Loss is the $500,000.00 Limit of Liability stated on the Declarations page for Employee Dishonesty Coverage Form A. Paragraph B. of that Form, Limit of Insurance, states:  "The most we will pay for loss in any one occurrence, is the applicable Limit of Insurance shown in the Declarations. " Paragraph D.3.b. defines the term "Occurrence" to mean "all loss caused by, or involving, one or more employees, whether the result of a single act or series of acts."

General Definition C.1. of TCN's Commercial Crime Coverage Part defines the term "Employee" to mean:

a.  Any natural person:
   (1)  While in your service (and for 30 days after termination of service); and
   (2)  **Whom you compensate directly by** salary, wages or **commissions**; and
   (3)  Whom you have the right to direct and control while performing services for you. (Emphasis added.)

Under this definition, both the 41 sales representatives who received excess commission payments and TCN.s Commissions Coordinator, who allegedly received kickbacks from the overpaid employees as a *quid pro quo* for arranging the overpayment of commissions, are TCN "Employees" within the coverage of the Policy.

**Scope of Coverage**

The scope of  "Coverage" provided by the Employee Dishonesty Coverage Form issued to TCN is defined by the initial sentence of Paragraph A., which states:  "We will pay for loss of . . . Covered Property resulting directly from the Covered Cause of Loss." Subparagraph A.1. defines Covered Property to include "Money".  TCN's Proof of Loss asserts a net loss of $648,899.73 as of July 8, 2009.  However, as evidenced by the concluding paragraph of TCN's narrative description of the alleged loss, TCN's claim appears to be based upon a bookkeeping calculation of the aggregate amount of all excess commissions advanced to TCN's sales representatives between January 2006 and April 2009  regardless of whether or not there is any evidence that the recipient of

the advance paid, or offered to pay, a kickback:

> An excel file is provided that shows all advisors who received **inappropriate advances and/or did not repay advances once received.** Included in the file and netted from the claim are amounts that have been recovered from advisors since the discovery of the loss. (Emphasis added.) [POL Narrative, p. 2, & 1.]

With regard to the alleged "inappropriate advances", the excel file presented in support of TCN's Proof of Loss does not distinguish between advances paid to employees intended to defraud TCN by paying kickbacks and advances paid to employees who were not part of any scheme to steal money from TCN. In this regard, TCN's Proof of Loss does not distinguish among at least three accounting categories that have apparently been aggregated to make up TCN's claimed net loss: 1) failure to recapture authorized advances against future commissions due; 2) failure to recapture unauthorized advances against future commissions due; and 3) failure of employees to repay excess commissions for which no sales had been booked by TCN.

As TCN's Chief Financial Officer explained in his recorded statement, most of the 41 sales representatives who received the "inappropriate advances" did not even realize they were being overpaid:

> ". . . one reason for keeping all these people active is we like to pride ourselves in having a very sophisticated method of reporting to our advisors what they're getting paid on each customer, and the feedback we're getting from most people is there's so much data and I don't understand it and I get my check and I go on. I don't look at the detail.
>
>                           \*     \*     \*
>
> And again these are sales people who are just looking how much [they're?] getting paid. And again, because we pay them over time, it's not well, I had a good two weeks; therefore, I should get a big check. Sometimes you could get a big check even when you didn't have a lot of current activity if a lot of payments came in for that period. [Recorded Statement, pp. 11-12.]"

TCN's CFO further explained that TCN has a complicated method of calculating and re-calculating the amount of commissions due each of TCN's sales representatives on each of the student contracts sold by each representative every two weeks. As a result, all commission payments made by TCN are merely advances that are subject to recapture, depending on the occurrence of future events:

> Alright, contract values typically run about 5,000. They range from several thousand up to almost 10. The advisors get 15 to 20 percent, and we don't pay it all at once. We're paid over time, so be for instance in some scenarios, they get half their commission immediately and then they get the other half as the customer makes monthly payments, the next three monthly payments. In some cases, it's over six monthly payments, you know. If the customer fails to make 12 payments, and most of em finance our program over 40 to 60 months [3 to 5 years], if they fail to make 12 payments, then we recover the commission so

there's quite a bit of math. [Recorded Statement, p. 3.]

In other words, every commission payment made to a TCN sales representative is subject to later recapture upon the default of the student. Therefore, if student defaults go up, the amount of commissions previously advanced by TCN to its sales representatives that is subject to recapture goes up potentially resulting in negative cash flow to TCN's sales representatives; i.e., the amount of previously paid advances that are subject to recapture exceeds the amount of commissions due to be advanced for the pay period.

TCN's Proof of Loss acknowledges that the net calculated deficit in the commissions accounts of 41 of its sales representatives as of the end of April 2009 had been reduced by $63,458.54, or approximately 9%, by the time the Proof of Loss was filed at the beginning of July. This reduction came from two sources, TCN's recapture of the advances from unpaid commissions due the overpaid representatives, coupled with voluntary repayments by the employees who received the excess payments. According to TCN's Proof of Loss, 30 of the 41 sales representatives who received the excess payments have been retained by TCN and are continuing to be paid commissions by TCN even though there is a deficit in their commissions account that TCN is seeking to recover from Cincinnati. Moreover, all but 14 representatives who received inappropriate advances had voluntarily repaid at least a portion of the excess commissions they received within the first two months after the overpayments were discovered.

The complex formula that TCN uses to calculate employee compensation every two weeks is a good illustration of the reason that the plain text of TCN's policy states that loss resulting from overpayment of employee compensation, including overpayment of "commissions", is not the type of dishonest conduct that is covered. In order to attempt to verify the accuracy of TCN's claimed loss, Cincinnati would have to employ accountants to verify the amount of commission payable and subject to recapture on every active student contract sold by each of the 41 sales representatives identified in TCN's Proof of Loss for each of the 86 pay periods between January 2006 and the end of April 2009.

Subparagraph A.2. of TCN's Employee Dishonesty Coverage Form provides that the "Covered Cause of Loss"is "Employee dishonesty." Additional Definition D.3.a. of the Employee Dishonesty Coverage Form defines "Employee Dishonesty" as the "Covered Cause of Loss" to mean:

> . . . **only** dishonest acts committed by an "employee," whether identified or not,
> **acting alone or in collusion with other persons** . . . with the manifest intent to:
> (1)    Cause you to sustain loss; and also
> (2)    Obtain financial benefit (**other than** salaries, **commissions**, fees,
>         bonuses, promotions, awards, profit sharing, pensions or other employee
>         benefits earned in the normal course of employment) for:
>         (a)    The "employee;" or
>         (b)    Any person or organization intended by "the employee" to receive

that benefit.  (Emphasis added.)

According to TCN's Proof of Loss, the only financial benefit received by TCN employees was derived from the receipt of "inappropriate advances" of "commissions." Under the plain text of the policy definition of "Employee Dishonesty", any loss resulting from the failure of a current or former TCN employee to repay "inappropriate commissions" received is not covered, regardless of whether the advance was a properly approved advance or an improper advance resulting from a kickback paid by the recipient.



Finally, even if loss resulting from the type of *quid pro quo* dishonest conduct alleged in TCN=s Proof of Loss was not beyond the scope of TCN's coverage, information furnished to Cincinnati regarding the possible payment of kickbacks in exchange for "inappropriate advances" is both vague and apparently limited to advances made to a single sales representative.  According to TCN's Proof of Loss, "TCN estimates that ████████ received at least $30,000 in kick-backs from sales representatives she overpaid." [POL Narrative, p. 1, & 3.]  Despite the apparent suggestion that multiple employees may have paid kickbacks, the Proof of Loss acknowledges that TCN only has evidence that one sales representative may have paid kickbacks: ███████████, a TCN sales representative in California, has advised TCN that he kick-backed to ████████ approximately $30,000 of the overpayments Ms. ████████ paid to ████████.@ [POL Narrative, p. 1-2, & 4.]

The recorded statement of TCN's Chief Financial Officer appears to confirm that as of August 13, 2009, the only evidence known to TCN relating to the payment of kickbacks is limited to statements made by ████████ to one of TCN's owners:

This one person ████████ (?), not ████████, ████████ (?), was a long-time friend of the owners, and he had a very emotional conversation on the phone that we either have notes or more information on, but he basically said she'd send him extra money **and he'd send it back to her, mostly**. (Emphasis added.) [Recorded Statement, p. 7.]

However, the recorded statement also concedes that ████████ unconfirmed statements about his own admitted dishonest conduct were vague and contradictory:

A.  She ████████ wrote checks for more than they should have been.  Now, we got the FBI involved that first week, and one of the advisors has admitted that.  And Tom [Brodnik], you can help me here.  At first he said he was giving her money back.  I think later on he changed his story to say he was loaning her money.

A2.  Yeah.

A.  And at one time, he said it was $10,000.  Then, I think he said it was $30,000 that he gave back to her.

A2.  Yeah, I think that's right.

Q.  Okay.

A.  This was ████████ ████████.  He's on that spreadsheet, and I think

I don't have that in front of me.  But it's, he got well over a 100,000 dollars in excess of what he should have, and he stated he gave about $30,000 of that back to her.  [Recorded Statement, p. 4.]

According to the spreadsheet that TCN furnished to Cincinnati, ███████ received excess commissions totaling $111,822.18, including an estimated $7,142.96 in 2006, $66,846.29 in 2007, $24,611.15 in 2008, and $13,221.78 in 2009.  There is no information regarding when ██████ claims he began making payments to ██████ or whether ██████ admits that all of the advances claimed by TCN were paid as the result of kickbacks he paid to ██████.  According to the Proof of Loss, ██████ had voluntarily repaid $4,881.69, reducing the deficiency in his commissions account to $106,940.49, but TCN has not furnished Cincinnati with any information regarding any arrangements made by ██████ to re-pay TCN.

Please let us know if you or your attorneys have any questions regarding Cincinnati=s analysis of TCN=s claim.

Respectfully,

Michael F. Fox
Associate Manager Bond Claims
The Cincinnati Insurance Company


CC: Bill Woods, Esq.
      Fox and Fox Inc.